IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BILLIE JAMES JUNGERT and BILLIE JEAN JUNGERT, Husband and Wife,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNION PACIFIC RAILROAD COMPANY, a Delaware Corporation; WEISER VALLEY HIGHWAY DISTRICT, a political subdivision of the State of Idaho; TERRY WAGONER; and PAUL GALLOWAY,<br><br>        Defendants. | Case No. CV-05-480-S-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it the Railroad's motion for summary judgment.[1]  The Court heard oral argument on February 5, 2007, and took the motion under advisement.  For the reasons expressed below, the Court will deny most of the motion, granting only that portion seeking to dismiss claims (1) that the train was traveling too fast and (2) that the Railroad was negligent for failing to sound an "emergency pattern" of a succession of short sounds prior to the collision.

---

[1] The Court will refer to the defendants collectively as the "Railroad."

## BACKGROUND

On November 2, 2004, the Railroad's train collided with a pickup truck driven by the plaintiff, Billie James Jungert. The collision occurred at a railroad crossing located just beyond the end of Island Road near the town of Weiser, Idaho.

The crossing is formed by a dirt and gravel road running from the Jungerts' home to the tracks, a distance of about 600 feet. The Jungerts have resided in this home since 2001, and during that time Jungert has driven over the crossing between 10 to 30 times a day.

At the location of the crossing, the railroad tracks run generally east-west, while the dirt and gravel roadway runs north-south. Jungert was driving northbound toward the crossing, and the train was approaching from the east. The crossing was protected by a stop sign located approximately 14 feet south of the railroad tracks at the crossing for southbound traffic. On the same sign post, there was also a private railroad crossing sign.

Jungert stopped at the stop sign. He neither saw nor heard the train and so started across the tracks. He has since testified that his view down the railroad tracks to the east was reduced by (1) high weeds and (2) a hump in the roadway that raised the front of his car, impairing his view of the tracks.

**Memorandum Decision and Order - Page 2**

Meanwhile, the train was approaching from the east at about 58 to 59 m.p.h. The train's engineer, defendant Paul Galloway, and its conductor, defendant Terry Wagoner, sounded the train's horn for about 17 seconds before entering the crossing. During that 17 seconds, the horn was sounded in a pattern of 5 seconds on, 1 second off, 4 seconds on, 1 second off, and 6 seconds on. At that instant, the train hit Jungert's truck on the tracks, ejecting him from his truck and causing the injuries for which he seeks recovery in this suit.

Jungert and his wife filed this negligence action originally in state court to recover damages from (1) the Weiser Valley Highway District, (2) Union Pacific, (3) Terry Wagoner, and (4) Paul Galloway. Following the dismissal of the Highway District, the Railroad removed the case to this Court.

## ANALYSIS

1. **Jungert's Negligence**

The Railroad argues that Idaho statutes required Jungert "to remain stopped at the stop sign as long as a train was within 1,500 feet of the crossing emitting an audible signal and was an immediate hazard, or was plainly visible and in hazardous proximity to the crossing." *See Railroad Reply Brief* at p. 7. The Railroad asserts that Jungert violated these statutes by moving onto the track when the train was (1) emitting an audible signal and (2) plainly visible.

**Memorandum Decision and Order - Page 3**

However, the Court finds questions of fact on both points.  First, there is no dispute that Jungert stopped at the crossing just before the collision.  *See Jungert Deposition* at p. 63.  As he was stopped, he thought he "heard an air horn from the train, but it was real distant and faint."  *Id*.  So he reached over and rolled down his passenger window (looking east) "so I could hear better, but then I didn't hear anything."  *Id.*  At that point, he testified, he "looked again and then proceeded to . . . eas[e] across the tracks."  *Id*.  It was at this point that the collision occurred.

The Railroad argues that Jungert must have heard the horn and bell because it is undisputed that they were sounded for about 17 seconds before the collision.  *See Railroad Opening Brief* at p. 9.  Certainly Jungert's testimony that he did not hear this horn is implausible.  However, the Circuit has held that such testimony, however implausible, must be presumed to be true.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988) (holding that in summary judgment proceeding, the district court may only reject implausible inferences from circumstantial evidence, not implausible direct testimony from the plaintiff/non-movant).

On the second point, Jungert testified that he never saw the train on the date of the collision.  *See Jungert Deposition* at p. 70.  While he could see to the west, the weeds blocked his view to the east, where the train was coming from.  *Id*. at 65.  In addition, his view to the east was impaired by the "nose" of his vehicle, which

**Memorandum Decision and Order - Page 4**

was elevated because he was required to stop on the "little hill in preparation to cross the tracks." *Id*. at p. 49.

The Railroad responds by proffering photos of the accident scene. *See Railroad's Statement of Undisputed Facts* at pp. 3-4. Those photos appear to show that Jungert had a completely unobstructed view for a long distance down the track.

Two agents of the Railroad, Jason Lloyd and Daniel Woolstenhulme, took the photos on the date of the accident. Both took their photos "from a point on the roadway just south of the crossing looking east toward the track." *See Woolstenhulme Affidavit* at ¶ 8, p. 3; *Lloyd Affidavit* at ¶ 13, p. 2. Both concluded that their photographs "accurately depict[ed] the view of a motorist stopped at the stop sign south of the crossing looking down the track on the day of the accident." *Woolstenhulme Affidavit* at ¶ 10, p. 3; *Lloyd Affidavit* at ¶ 14, p. 2.

All the photos appear to have been taken by a person standing by the road rather than sitting in the driver's seat of a pickup truck at the stop sign. Thus, the Court cannot tell from the photos whether a driver's view down the track to the east would be obstructed by the inclined "nose" of his vehicle. Moreover, no measurements accompany the photos as is the case with photos submitted by an expert in the field of accident reconstruction.

**Memorandum Decision and Order - Page 5**

The Railroad wants the Court to rule as a matter of law that the photos destroy the credibility of Jungert's testimony that his view was obstructed. The Court refuses to so find for two reasons. First, the photos would not necessarily compel a reasonable juror to disbelieve Jungert, because it is unclear whether the represent accurately the same view he had of the track and train. Second, this Court cannot reject even implausible testimony from Jungert in this summary judgment proceeding, as discussed above. *See Liu,* 849 F.2d at 1208.

For all these reasons, the Court refuses to grant summary judgment to the Railroad finding Jungert negligent as a matter of law.

### 2. Use of the Horn

The Railroad seeks summary judgment dismissing any claim that they were negligent for failing to sound the horn in an "emergency pattern" consisting of a succession of short sounds. They contend that the undisputed evidence shows that they satisfied Idaho law by sounding the locomotive's bell and horn for more than 1,400 feet, and 16-17 seconds, prior to the crossing.

This evidence shows that the Railroad complied with both Idaho law (Idaho Code § 62-412) and its own operating rules (Rule 5.8.2(11)). Jungert does not argue that the Railroad violated either of these rules.

Instead, Jungert claims that the Railroad should have sounded a different

**Memorandum Decision and Order - Page 6**

pattern of successive short sounds, that the Court will refer to as the "emergency pattern." In support of this argument, Jungert submits the expert report of Charles Culver. He was a certified locomotive engineer for the Railroad and was an instructor for them on Operating Rules, Safety Rules, and Train Handling Rules. *See Culver Report* at p. 1.

Culver testified that "when the driver of an approaching automobile is not responding to the sound of the locomotive's audible warning, the engineer must alter the pattern of his signal in an effort to alert the driver of the presence of the train." *See Culver Report* at p. 4. He concludes that a series of short sounds "would have provided a more effective warning of the train's approach." *Id*. at p. 5. Culver observed that in his own experience operating trains for the Railroad, "this method of audible warning has enabled me to attract the attention of a driver who was not responding to the presence of the train, whereby I was able not only to make my presence known, but to relay the frantic nature of the message that the train can not stop, and the driver must take evasive action to avoid the collision." *Id*. at pp. 5-6.

Culver does not conclude that any existing rule – or even industry custom – requires a series of short sounds. Rather, he relies on (1) a single anecdote from his past, (2) a past rule of the Railroad that is no longer in force, and (3) a snippet

**Memorandum Decision and Order - Page 7**

of testimony in another trial from Clifford Shoemaker, Union Pacific's Director of Industry and Public Projects

In the single anecdote related above, Culver fails to provide crucial details that would allow comparison of the anecdote with the incident here. If his incident was different from the incident here, it would have little relevance. For example, it would be crucial to know whether Culver's emergency pattern got the driver's attention *after Culver's more continuous sounding failed to do so*. Yet his report is silent on this – he says nothing about what horn pattern he sounded before sounding the emergency pattern.

Without this detail, Culver's anecdote does not support his claim, which is that an emergency pattern will get a drivers' attention *when the more continuous sounding will not*. Moreover, the Court has no idea of the layout of the crossing in Culver's case – was his train coming around a corner such that a driver may not hear anything until the late-blown emergency pattern? Or was it a wide-open layout as here? Such basic unanswered questions render any comparison impossible, and make the anecdote irrelevant. *See McClain v. Metabolife Intern. Inc.*, 401 F.3d 1233, 1254 (11th Cir. 2005) (holding that "anecdotal evidence will not cure [the expert's] failure [to offer scientifically reliable data]").

With regard to Shoemaker's testimony, Culver quotes five lines from his

**Memorandum Decision and Order - Page 8**

deposition taken in another case. In that testimony, Shoemaker states that "several studies . . . do say that broken patterns versus one long continuous pattern are more recognizable or will break through other sound barriers." *Id*. at p. 4.

Culver is not relying on Shoemaker as an expert. Instead, he uses Shoemaker's testimony to show that the Railroad had "prior knowledge as to the effectiveness of the [emergency pattern]." *Id*. at p. 4.

Again, there are unanswered questions. What does Shoemaker mean by "broken patterns?" Is he referring to the "emergency pattern" of a succession of short sounds that Culver advocates? What does Shoemaker mean by "one long continuous pattern?" Is he referring to something similar to what the Railroad's train horn blew in this case?

These questions cannot be answered from the five-line snippet of deposition testimony quoted by Culver. Moreover, Culver says nothing about the studies referred to by Shoemaker. The Court has no way of knowing whether those studies have any relevance to this case; indeed, Culver himself does not say that he relied upon those studies in any way in forming his opinion.

An expert may rely on all sorts of evidence if it is "of the type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *See Fed.R.Evid. 703*. Culver relies on Shoemaker's testimony

**Memorandum Decision and Order - Page 9**

to show that the Railroad had notice of the effectiveness of the "emergency pattern." Because the five-line deposition snippet does not indicate whether Shoemaker is comparing a short succession of sounds to the horn-blowing pattern actually done in this case, the snippet is irrelevant and cannot be used to find, as a matter of law, that the Railroad had notice that a short succession of sounds would have been more effective than the horn-blow pattern actually used in this case.

Finally, Culver concludes that because a past Railroad rule required a short succession of sounds when a person was on the track, the Railroad should have sounded that pattern here. It is undisputed, however, that this rule had been changed about 4 years prior to the accident to no longer require that pattern when a person was on the track. There is no evidence addressing why the rule was originally adopted and why it was changed. There is no evidence that the rule represented an industry custom or practice. There is no case, statute, or regulation requiring the Railroad to sound a succession of short sounds in this instance.

Perhaps most importantly, there is no competent and admissible evidence that a short succession of sounds would have made any difference. No expert audiologist has been proffered by Jungert. While Culver testified that it would have made a difference, he bases this conclusion on a single anecdote, the details of which he never provided so that it can be compared to this case. He relies on no

**Memorandum Decision and Order - Page 10**

identified studies indicating that the emergency pattern would make a difference, and relies on no qualified experts in so concluding. At bottom, Culver is attempting to qualify as an expert audiologist, a position for which he holds no qualifications.

The Court therefore finds that Culver's testimony cannot be used to create a duty on the part of the Railroad to blow a succession of short sounds. The Court is therefore left with Jungert's testimony that he did not hear the train, and the Railroad's argument (by counsel) that such testimony is implausible given the 17 seconds of horn-blowing with no obstacle between train and truck.

As the Court discussed above, the Court cannot reject the testimony of Jungert in this summary judgment proceeding, however implausible. *See Liu*, 849 F.2d at 1208. Thus, while the Court will grant a partial summary judgment that the Railroad had no duty to sound a short succession of sounds prior to the incident here, the Court refuses to grant any broader summary judgment on liability because there are questions of fact whether Jungert heard the horn.

3.     **Excessive speed**

The Railroad seeks summary judgment precluding any claim that the train was operating at an excessive speed, because the evidence is undisputed that it was traveling well-within the federal speed limit. The Court agrees. *See CSX Transp.,*

*Inc. v. Easterwood*, 507 U.S. 658 (1993).

**4.      Extra-Hazardous Crossing**

The Railroad contends that the Jungerts have failed to establish a claim that the crossing was more than ordinarily hazardous. The Jungerts respond by citing the report of their expert, James Loumiet. He concluded that the crossing "was extra-hazardous at and before the time of the subject collision and as such was a causative factor in the subject collision." *See Loumiet Report* at p. 5.

In *CSX*, the Supreme Court held that regulations adopted by the Secretary of Transportation under the Federal Railroad Safety Act do not preempt state common law negligence claims regarding a railroad's duty to maintain warning devices at railroad crossings. Therefore, if a particular railroad crossing is extra-hazardous and the railroad fails to provide additional safeguards at the crossing, it may be held liable for negligence. *See Hayes v. Union* Pacific, 141 P.3d 1073, 1077-78. Loumiet concludes that the crossing is extra-hazardous because of (1) steep approaches and humped profile, (2) a skewed crossing angle, and restricted sight distance, (3) rough crossing surface, and (4) traffic control devices. *See Loumiet Report* at pp.7-17.

The Railroad responds by pointing out that the first three factors "relate to the condition on [the Jungerts'] own private roadway, and not the track or crossing

**Memorandum Decision and Order - Page 12**

itself." *See Railroad Reply Brief* at p. 10.  Yet by federal statute, the Railroad right-of-way extends 100 feet on either side of the tracks.  *See* 43 U.S.C. § 934.  The Railroad has the exclusive right to use and possess the right-of-way created by the statute.  *See Oregon Short Line Railway Co. v. Stalker*, 94 P. 56 (Id.Sup.Ct. 1907).  It appears that Loumiet's testimony relates to shortcomings within the Railroad's right-of-way.  Given this, the Court cannot find as a matter of law in this summary judgment proceeding that the Railroad is not responsible for the flaws identified by Loumiet in the "crossing."[2]

The Railroad argues next that Loumiet's factors merely render the crossing "ordinarily" hazardous and not extra-hazardous.  But the Railroad does not back this up with any expert testimony and merely asks the Court to ignore Loumiet's testimony.  The Court can find no reason to do so.

The Idaho Supreme Court, in reversing a grant of summary judgment for the Railroad on an extra-hazardous crossing issue, held that "[i]t is up to the jury to decide whether there are things about the intersection that would require a prudent railroad to install additional warning devices and whether these warning devices

---

[2] At oral argument, the Railroad's counsel cited Loumiet's deposition testimony that it was traditional for the term "crossing" to include only two feet on either side of the tracks.  However, this testimony was not proffered by the Railroad in its written submissions or discussed in its briefing.  The Railroad cannot raise it for the first time in oral argument, and the Court will therefore disregard it.  Moreover, it is not clear whether such a "tradition" would have any legal effect in the face of the federal statute discussed above.

**Memorandum Decision and Order - Page 13**

may have prevented [the plaintiff] from sliding/driving onto the railroad track." *Hayes*, 141 P.3d at 1078.  The Court is governed by Idaho law in this negligence action, and hence must follow *Hayes*.  The Court will accordingly deny summary judgment on the extra-hazardous issue.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the Railroad's motion for summary judgment (Docket No. 15) is GRANTED IN PART AND DENIED IN PART.  It is granted to the extent it seeks (1) to dismiss any claim, and exclude any argument or testimony that, the train was traveling too fast, and (2) to dismiss any claim, and exclude any argument or testimony, that the Railroad had a duty to sound a succession of short sounds prior to the incident here.  It is denied in all other respects.

DATED:  **February 21, 2007**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision and Order - Page 14**